# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LADALE RICH, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 17-02328 (TFH) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Ladale Rich is a veteran of the United States Navy who suffered traumatic injuries in a motorcycle accident on May 21, 2014. In November 2014, Rich submitted a claim for benefits under the Servicemembers' Group Life Insurance Traumatic Injury Protection ("TSGLI") program, stating that he was unable to independently perform at least two "activities of daily living" ("ADLs") as a result of his injuries. The Navy initially denied Rich's claim in full. Rich applied for reconsideration, and his claim was approved for the first 30 days of claimed losses but denied for the remaining 30 days. Rich appealed the partial denial several times, and the Board for Correction of Naval Records ("BCNR") ultimately denied his claim on January 3, 2017.

Rich filed this lawsuit against the United States on November 6, 2017, arguing that the Court should vacate the BCNR's decision because it was arbitrary and capricious under the Administrative Procedure Act ("APA"). The parties filed cross-motions for summary judgment [ECF Nos. 11, 14], and the Court held a motions hearing on December 6, 2018. For the reasons that follow, Rich's motion will be granted in part and denied in part, and the United States's motion will be denied.

I.  **BACKGROUND**

   A.  **The TSGLI Program**

TSGLI provides short-term financial assistance to service members and veterans who have suffered traumatic injuries. *See* 38 U.S.C. § 1980A. To receive TSGLI benefits, a service member must show that he or she has suffered a "qualifying loss," which includes the inability to "independently perform" at least two out of six ADLs: bathing, continence, dressing, eating, toileting, and transferring in or out of a bed or a chair with or without equipment. 38 U.S.C. § 1980A(b)(1)(H); 2(D); 38 C.F.R. § 9.20(e)(6)(vi). For claims based on inability to carry out ADLs, a service member who has suffered a traumatic injury other than a brain injury must establish that he or she was unable to perform the ADLs for a minimum of 30 consecutive days. 38 C.F.R. § 9.20(f)(20). "TSGLI will pay $25,000 for each consecutive 30-day period of ADL loss, up to a maximum of $100,000 for 120 consecutive days." *Hensley v. United States*, 292 F. Supp. 3d 399, 402 (D.D.C. 2018) (quoting *Austin v. United States*, 614 F. App'x 198, 200 (5th Cir. 2015)). District courts have original jurisdiction over civil actions against the United States relating to TSGLI. *See* 38 U.S.C. § 1975.

   B.  **Rich's Injuries & Medical Treatment**

On May 21, 2014, while still on active duty in the Navy, Rich was involved in a serious motorcycle accident that resulted in fractures to both of his ankles, severe road rash, and a deep wound injury to his left knee.[1] On the day of the accident, Rich was admitted to Naval Hospital Jacksonville, where he was diagnosed with a left ankle fracture and taken to surgery for irrigation and debridement of his left knee wound and debridement of abrasions on both arms.

---

[1] As explained herein, Rich's right ankle fracture was not diagnosed until approximately 3 weeks after his accident.

AR 344-45. Rich was discharged from the hospital on May 23, 2014 with a splint on his left ankle (non-weight bearing) and a CAM walker boot on his right ankle (weight bearing as tolerated). AR 465, 468. At Rich's first post-operative visit on May 27, 2014, Dr. Paul Shupe, his orthopedic surgeon, noted that Rich "is mobilizing in a wheelchair. He also uses a walker." AR 467. Dr. Shupe directed Rich to follow-up in one week for removal of the stitches on his left knee and conversion from a splint to a cast on his left leg. AR 345. At the conclusion of the May 27, 2014 appointment, Dr. Shupe released Rich "w/o Limitations." AR 468.

Approximately two weeks after the accident, on June 4, 2014, Rich had another appointment with Dr. Shupe, who noted that Rich's "primary complaint at this time is pain within the right ankle." AR 462. Dr. Shupe referred Rich for an MRI of his right ankle and converted his left ankle from a splint to a cast. *Id.* Rich was "Released w/ Work/Duty Limitations" on June 4. *Id.* The subsequent MRI revealed multiple fractures in Rich's right ankle, and Dr. Alex Vincent, a "foot and ankle specialist," recommended a further CT scan "for better definition of the skeletal injuries." AR 339. On June 19, 2014, Rich had a follow-up appointment with Dr. Shupe, who indicated that he expected "operative treatment of the right foot" following the CT scan and noted that Rich "was provided with a light duty chit." *Id.* Rich was "Released w/o Limitations" on June 19. *Id.*

After the CT scan of Rich's right ankle, which confirmed "multiple ankle fractures, to include the posterior facet of the subtalar joint . . . as well as the anterolateral aspect of the posterior facet of the talus," Rich had another appointment with Dr. Shupe on June 24, 2014. AR 454. In order to "allow for his left lower extremity fibular fracture to heal in [sic] for his cast to be removed prior to undergoing operative intervention on the right" ankle, surgery to repair

3

Rich's right ankle was planned for the week of July 7. AR 454-55; 336. Again, Dr. Shupe noted that Rich was "Released w/o Limitations." AR 455.

At his pre-operative orthopedic visit with Dr. Shupe on July 7, 2014, the cast on Rich's left ankle was removed and he was transitioned to a removable CAM boot on the left leg. AR 332. Dr. Shupe noted that Rich was then "weight bearing as tolerated" on the left ankle, and Rich was released "w/o Limitations." *Id*. The following day, July 8, 2014, Dr. Shupe performed surgery on Rich's right ankle, during which he removed multiple bone fragments and implanted several surgical screws and other hardware. AR 445-447. Rich was placed in a splint following surgery, and Dr. Shupe's post-operative notes indicated that Rich would "be non weightbearing on his lower right extremity. He will be seen back in the Orthopedic Clinic in 10-14 days' time for suture removal." AR 447.

At his July 25, 2014 post-operative visit, Dr. Shupe noted that Rich's pain in his right ankle was improving and was "limited by immobilization of the foot." AR 328. Rich's right ankle was converted from a splint to a cast, and Dr. Shupe recommended that he be "[n]on-weight-bearing lower left [sic] extremity with walker until fracture healing is observed." *Id*. Dr. Shupe's notes from July 25, 2014 also indicate "LIMDU initiated at today's appt," an apparent reference to Rich's assignment to "Limited Duty." *Id*. Dr. Shupe referred Rich for physical therapy on his left ankle, and he was "Released w/o Limitations" and instructed to follow up in 4 weeks with the Orthopedic Clinic. *Id*.; AR 442. Rich's first physical therapy consultation, which was limited to his left ankle at that time, took place on July 31, 2014. AR 439.

C. **Procedural History**

Rich submitted his first TSGLI application on November 7, 2014 with a Medical Professional's Statement from Dr. Shupe claiming that Rich was unable to independently

4

perform the ADLs of bathing, dressing, eating, toileting, and transferring from the dates of May 21, 2014 to July 2, 2014. AR 1, 4; AR 13, 14. Dr. Shupe included a note stating "Pt had bilateral lower extremity injuries requiring no weight bearing. This required hands on assistance until WB status was changed 2 July." AR 13.[2] Rich's initial claim sought coverage for ADL losses of 30 days.

By letter dated December 10, 2014, Prudential's Office of Servicemembers' Group Life Insurance denied Rich's initial claim: "Your claim for inability to independently perform Activities of Daily Life (ADLs) due to traumatic injury (other than traumatic brain injury) was not approved because there is not enough medical information to support that you could not perform ADLs independently." AR 22. The letter informed Rich of the type of information that must be presented to support his claim and further stated that "[b]ecause your claim did not have the necessary information, your branch of service could not approve your claim." *Id.*

Following receipt of the December 10, 2014 denial letter, Rich corresponded several times via email with Mary Koontz, Navy Program Manager for Traumatic Injury & Family SGLI. AR 25-28. On December 23, 2014, Ms. Koontz emailed Rich:

> CS1, the reason you were denied is despite being bilateral lower legs, your medical records clearly states [sic] you were weight bearing on crutches and you started physical therapy on day 43. Both which stop any ADL losses.

AR 27. Rich informed Ms. Koontz that the information in her email was incorrect, and their correspondence concluded on December 29, 2014 with Rich stating that he would discuss the matter with his surgeon [Dr. Shupe]. AR 25.

---

[2] It is not clear where Dr. Shupe got the July 2 date, as there is no indication in the medical records submitted with the Administrative Record that Rich was seen by Dr. Shupe on that date or that any change was made to his weightbearing status at that time. In fact, the surgery on Rich's right ankle did not take place until July 8.

5

Rich retained counsel, and on May 26, 2015, he submitted a request for reconsideration of the denial of his first claim for TSGLI benefits for 30 days of ADL losses, and a supplemental claim for ADL losses for over 60 days. AR 31-32. This supplemental claim asserted that Rich was unable to independently perform the ADLs of bathing, dressing, toileting, and transferring from May 21, 2014 to July 22, 2014. AR 47-50. In addition to his medical records, Rich submitted:

(1) a declaration regarding his injuries and inability to independently perform ADLs (AR 51-52);

(2) a declaration from his fiancée, Melanie Escobar, who helped provide care to Rich during his recovery (AR 53-54); and

(3) a medical professional's statement from an independent registered nurse, Nancy Olson, RN, MSN, who reviewed Rich's medical records and concluded that the evidence showed he could not independently perform the claimed ADLs for at least 60 consecutive days (AR 55-58).

Rich's declaration stated in part:

3. Upon discharge, I was identified as a "fall risk", and was asked if anyone would be able to take care of me. Since I was living in the barracks at that time, it would not be feasible for me to return there, given my injuries and the stairs. Instead, I went to live with my fiancée Melanie at her mother's house, which was a flat-level home. I was provided with a wheelchair and walker, but most of the time I had to stay in bed, as Melanie had to work, and I couldn't get up without her help. Melanie's mother and sister helped me out when she was at work as much as they could.

4. I remember being in tremendous pain. Due to the road rash, I had dressings on both arms that were wrapped, and needed to be changed daily. My arms hurt so much that it was too painful for me to eat. Melanie fed me for the first couple weeks, and took care of my dressings.

5. Transferring from bed was limited to when someone could help me. I would have to slide to the edge of the bed, and someone would stand with the walker steady, so I could pull myself up. I had to put my hands around their arms, and they helped me at my waist, due to the intense pain from the road rash and ankle injuries, and the limitations of the splint. My legs were very weak, and I needed hands-on assistance so I would not fall. I needed this assistance until at least July 22, 2014.

6.  For bathing, Melanie would either sponge-bathe me in bed, or transfer me to the edge of the bathtub, where she would wash my wounds, and use a shower head device, while keeping my splinted leg covered. She used an antiseptic wash on my wounds.

7.  For toileting, I mainly used a urinal, which Melanie had to empty. When I had to move my bowels, I needed assistance to the bedside commode, and then someone would have to empty and clean it for me. This continued until at least July 22, 2014.

8.  For dressing, Melanie went out and bought me loose clothing, such as sweatpants and loose shorts. Shirts were painful to put on and take off. The road rash looked like burns, and was treated as such. I would need assistance to sit up, and hold on to something while she removed my shirt and pants. Twice a day, she wrapped my arm dressings from shoulders to hands to prevent infection.

9.  I continued to have pain in my right ankle that was not improving. Two weeks after the accident, my doctor ordered an MRI of the right ankle, which showed that I needed surgery. On July 8, six weeks after the accident, I had surgery on my right ankle. Just as I had not been able to bear weight on my left leg, now I was not to bear weight on my right.

10. I continued to need assistance with ADLs of transferring, toileting, bathing, and dressing up until this right ankle surgery on July 8, and for at least two weeks after (July 22). On July 25, 2014, I was cleared to begin physical therapy, and LIMDU was initiated. I am still dealing with a damaged nerve in my right ankle, and will need another surgery to it soon. I currently walk with a cane, and perform light duty work at a computer here in Jacksonville.

AR 51-52. Melanie Escobar's declaration stated as follows:

2.  I provided my fiancé, LaDale Rich, with physical and standby assistance after he suffered fractured ankles and severe road rash as the result of a motorcycle [sic] on May 21, 2014. He was taken by car to Naval Hospital of Jacksonville, where he underwent surgery for debridement of his wounds, and splinting of his left ankle. He was discharged on May 23, with a wheelchair and walker, and was instructed not to bear any weight on his left leg. He came to live at my mother's house, as he was not fit to return to the barracks, and required constant assistance and observation so that he would not fall. He needed constant assistance until at least July 22, 2014.

3.  When LaDale got home, he was wrapped up like a mummy. He had so much road rash on his arms and him [sic] left knee that he had many dressings. I cleaned his wounds twice a day. Although they told me once

7

a day was enough to change his dressings, the wounds were draining, and the dressings would often slide out of place when he tried to move, so I ended up changing them a second time. For the dressings, I would clean the wounds with saline, apply an antiseptic wash, pat dry and cover the wounds with Vaseline gauze, then wrap with gauze.

4. For the first 3 weeks, I had to feed him, due to the pain in his arms and shoulders. He took his pain med oxycodone, but still was in a lot of pain that made it difficult to use his arms as well as his legs.

5. For LaDale to transfer out of bed, I would have him move his feet to the edge of the bed. Then I would push the walker as close to the bed as I could, so that he could pull up. I told him to put his arms on my shoulders, and I would put my arms under his. He's much bigger than I am, so we had to limit the times he actually got out of bed. I am a certified medical assistant, so I used the experience I had with his transferring (and dressing changes). Once he was up and walking with the walker, I would walk backwards to the bathroom or wherever we were going, to make sure he didn't fall.

6. For bathing, I bathed him a lot in the bed. I used the big pads to keep things dry. When he felt like he really needed more, I would get him out of bed to the tub every 2-3 days. There I would cover his cast with plastic, have him sit on the edge of the tub and keep that leg outside the tub. We had a shower head for me to use on him. There was no way he could stand in the shower. This continued until at least July 22, 2014.

7. For toileting, he used a urinal, which I would empty. He used a bedside commode for bowel movements. During the day while I was at work, my sister and mom would help him with toileting and emptying the urinal and commode, until at least July 22.

8. For dressing, I went out and got him new clothes that were loose. Pajama shorts and extra-large t-shirts were helpful. I would get the shirts over his arms first, then his head. For pants, I would put on one leg at a time, and have him raise his bottom while lying down, like a baby. He was dependent on me to dress him due to his pain and weakness.

9. We found out weeks after the accident that his right ankle was shattered. He was dependent on me and my mom and sister up until the time of his right ankle surgery on July 8, and for at least two weeks after, which was July 22, 2014.

10. LaDale is still not walking properly. He needs more surgery to his right ankle at this time.

AR 53-54.

By letter dated July 8, 2015, the Commander of Navy Personnel Command informed Rich that his "request for reconsideration has been approved for $25,000 for loss of Activities of Daily Life (ADL) Other than Traumatic Brain Injury (OTI). Other losses claimed were not approved." AR 479. The letter stated that

> [t]he medical evidence you provided was evaluated by a Medical Officer assigned to the Navy Personnel Command. It was determined that your loss of the ability to bath, dress, toilet, or transfer yourself without assistance for more than 30 but less than 60 days was now documented in your Navy medical records.

*Id*. The letter went on to explain that "[m]edical documentation provided with your claim supported only 43 days of loss. There was insufficient information to support the medical professional's statement for more than 60 days as submitted." AR 480. This letter did not reference review of any evidence other than medical records, providing no indication that the statements of Rich or Ms. Escobar were reviewed or considered.

Rich submitted an appeal of the partial denial to the TSGLI Appeals Board on August 7, 2015. AR 483-84. On January 11, 2016, the Department of the Navy Appeals Board for Traumatic Injury Protection under the TSGLI program informed Rich that

> [a]fter a thorough and comprehensive review of the case file and all medical documentation, to include the recently submitted and new material evidence, the Appeals Board voted unanimously to disapprove the TSGLI appeal for 60 days of Activities of Daily Living (ADL) loss (bathe, dress, toilet, and transfer) due to Other Traumatic Injury (OTI).
>
> . . .
>
> The Appeals Board found that the preponderance of the evidence does not support that CS1 Rich required assistance for two or more ADLs for a period of 60 days or more.

AR 486.

Rich submitted his next appeal to the Navy Council of Review Boards on February 9, 2016, along with the following additional materials:

(1) A statement from an independent registered nurse, Terri Burns, RN, BSN, which concluded: "It is my professional opinion, that the ADL losses suffered by Mr. Rich during the first 30 days (5/21/14-6/19/14) are no different from the losses suffered during the following 30 days (6/20/14-7/22/14)." (AR 493-95);

(2) New and material medical records;[3] and

(3) A supplemental statement from Rich (AR 496-97).

AR 488. Rich's supplemental statement, dated February 9, 2016, stated as follows:

> After my right ankle/foot MRI was done on June 4, 2014, the doctor immediately ordered me to stop bearing weight on my right leg. So, I was now non-weight bearing on both legs. Because, I was already ordered to be non-weight bearing on my left leg following that surgery. On July 7, 2014, I had the left cast removed. And, they put me in a Cam boot. I couldn't use crutches. I had to wait a little bit. Because, they had to wait to see if I could bend my left knee. My left knee had been split open in the accident. I had to also wait and see if I could put weight on my left ankle. I was having issues with it for a while. Then, on July 8, 2014, I had surgery on my right ankle/foot. After they did the surgery on my right ankle, I was on bedrest. I could not walk or do anything. Then, after a few weeks, they gave me a new cart to relieve the other ankle. I am seeing an outside pain specialist. They are going to do a radioactive procedure to cut my nerve to kill it. And, I will lose the feeling on the top of my foot. Right now, two of my toes do not have feeling in them. Because, they already did a partial nerve removal. I still have issues walking. I have to walk with a cane. I am currently in the process of being medboarded from the military.

AR 496-97.

On February 29, 2016, the Director of the Secretary of the Navy Council of Review Boards denied Rich's reconsideration request, stating in part:

> I have determined your reconsideration request does not contain any new material evidence not previously considered by the board that could result in a different outcome. Neither the summary dated 9 February 2016 by Ms. Burns nor the 9 February 2016 statement from Petty Officer Rich provide information not

---

[3] It is not clear based on the Administrative Record what these "new and material medical records" were.

previously available in his TSGLI file. Therefore, I will not direct reconsideration of Petty Officer Rich's case by the TSGLI Appeals Board.

AR 536.

Following denial of his reconsideration request, Rich submitted an Application for Correction of Military Record to the BCNR on March 11, 2016. AR 537. In addition to all previous materials, Rich submitted a statement dated March 8, 2016 from Kendra Clayton, his fiancée's sister, who was living at the home with Rich and Ms. Escobar following the accident and during Rich's period of recovery:

> 2. I provided my sister's fiancé, LaDale Rich, with physical and standby assistance after he suffered fractured ankles and severe road rash as the result of a motorcycle [sic] on May 21, 2014. He came to live at my mother's house after his discharge from the hospital, as he was not fit to return to the barracks, and required constant assistance and observation so that he would not fall. He needed constant assistance until at least July 22, 2014.
>
> 3. My sister Melanie provided most of LaDale's care, but when she had to work during the day, my mother and I helped him out. For the first couple of weeks, we even had to feed him, due to the pain in his arms and shoulders from the road rash. My mother fixed most meals for him in Melanie's absence, and I helped out as well.
>
> 4. For LaDale to transfer out of bed, I would have to physically help lift him. I am a Certified Nursing Assistant, so I had a gait belt that I would use to help safely lift him out of bed. He would often sit in a wheelchair, just to be out of bed.
>
> 5. For toileting, he used a urinal, which I would empty. He used a bedside commode for bowel movements. It was embarrassing for him to need help from me when Melanie wasn't around, and he tried to do as much for himself as possible, but he was limited by his pain and weakness, from the road rash and broken ankles.
>
> 6. LaDale was dependent on Melanie and my mom and me until the time of his right ankle surgery on July 8, and for at least two weeks after, which was July 22, 2014. My mom and I provided assistance with transferring and toileting during this time. Melanie provided assistance with bathing and dressing as well.

AR 539.

> The BCNR denied Rich's application by letter dated January 3, 2017:
>
> A three-member panel of the Board for Correction of Naval Records, sitting in executive session, considered your application on 17 November 2016. Your allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. **Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, your naval record and applicable statutes, regulations and policies**.
>
> A review of your record shows you suffered a traumatic injury involving a motorcycle accident on 21 May 2014. This accident resulted in fractures to both ankles and left fibula along with road rash to both arms. As a result of your injuries, you filed a Traumatic Servicemembers' Group Life Insurance (TSGLI) claim for loss of at least two Activities of Daily Life (ADLs) for more than 60 days on 7 November 2014. After your initial claim was denied, your request for reconsideration was partially approved for 30 days loss of ADLs on 8 Jul 2015. You appealed the reconsideration decision to the TSGLI Appeals Board and were denied on 11 January 2016. Your request for reconsideration to Director, Secretary of the Navy Council of Review Boards was denied on 29 February 2016.
>
> The Board carefully considered your arguments that you were unable to transfer, toilet, bathe, or dress without required assistance from 21 May 2014 through 22 July 2014. **Unfortunately, the Board did not find sufficient medical evidence to support relief in your case.** The Board understands that you suffered traumatic injuries and received assistance in the performance of ADLs after your release from the hospital on 23 May 2014. However, **the Board was not convinced that the extent of your injuries required continued assistance to perform the ADLs through 22 July 2014. Despite the need for additional surgery on 8 July 2014, the Board felt there was insufficient medical evidence that showed you continued to suffer from serious symptoms from the initial treatment to your left leg and arms that prevented you from independently performing ADLs after your second surgery. Further, the Board concluded that your surgery to your right ankle was not sufficiently impairing to your ability to independently perform ADLs that you would have required assistance**. Accordingly, the Board was unable to find an error or injustice warranting a correction to your record and denied your application.

AR 572 (emphasis added). Rich then filed this lawsuit on November 6, 2017.

## II.     STANDARD

Federal Rule of Civil Procedure 56 mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (internal quotation marks and citations omitted). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*; *see also Richards v. INS*, 554 F.2d 1173, 1777 (D.C. Cir. 1977).

Under the APA, the Court may only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This is a "narrow" standard of review, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, a decision that is not fully explained can only be upheld "if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). The court "may not supply a reasoned basis for an agency action that the agency itself did not give in the record under review." *Pierce v. SEC*, 786 F.3d 1027, 1034 (D.C. Cir. 2015). Agency action may be set aside as arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or

13

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43.

## III. ANALYSIS

The United States concedes that Rich suffered a covered traumatic injury. Mem. in Supp. of Def.'s Mot for Summ. J. 2; AR 572. The parties' dispute, then, relates to whether Rich suffered a "qualifying loss" under the TSGLI schedule of losses for a period of 60 consecutive days.

### A. Whether the BCNR applied the incorrect burden of proof.

Rich first argues that the BCNR erred in applying the wrong burden of proof to the evaluation of his claim. Pl.'s Mem of P. & A. 18. The parties agree that the appropriate evidentiary standard for TSGLI determinations is preponderance of the evidence. Pl.'s Mem of P. & A. 18; Def.'s Opp'n 5; *see also* SECNAV Instruction 1770.4 § 3(e)(2) ("The evidentiary standard for TSGLI determinations is a preponderance of the evidence.").

Rich argues that the BCNR failed to consider the preponderance standard when reviewing his claim, but the crux of this argument is that the BCNR failed to properly consider the evidence he submitted. While it is true that the BCNR's decision letter does not explicitly state that it applied a preponderance of the evidence standard in reviewing Rich's claim,[4] there is no evidence indicating that the BCNR applied a higher standard. Accordingly, this challenge is more appropriately evaluated in connection with whether the BCNR failed to consider all of the

---

[4] The TSGLI Appeals Board's denial does state "[t]he Appeals Board found that the preponderance of the evidence does not support that CS1 Rich required assistance for two or more ADLs for a period of 60 days or more." AR 486.

evidence submitted by Rich in support of his claim, and whether its failure to do so was arbitrary and capricious.

### B. Whether it was arbitrary and capricious for the BCNR to fail to consider first-hand caregiver statements.

Rich argues that it was arbitrary and capricious for the BCNR to either fail to consider or to discount the first-hand statements of his caregivers regarding his inability to independently perform ADLs for 60 days. Pl.'s Mem of P. & A. 26-31. The BCNR's denial letter states that "[d]ocumentary material considered by the Board consisted of your application, together with all material submitted in support thereof," AR 572, but there is no further indication in the record that the BCNR reviewed Rich's initial or supplemental statements, or the statements of Melanie Escobar or Kendra Clayton.

Citing the BCNR's statement that it had considered Rich's "application, together with all material submitted in support thereof," the government argues that "[i]t is . . . clear that the BCNR considered the letters submitted by Plaintiff's fiancé, his fiancé's sister, and his mother-in-law, along with all other evidence attached to his petition." Def.'s Opp'n 6. As an initial matter, it should be noted that there is no evidence in the record of a letter having been submitted by Rich's "mother-in-law," so it is not clear what the government is referring to here. Regardless, it does not seem "clear" that any of this evidence was reviewed by the BCNR, or at any prior stage in the adjudication of Rich's claim, as the evidence is never specifically referenced or discussed in any of the Navy's decisions.

Courts have found that an agency's failure to consider, or to discount, first-hand caregiver statements without explanation may render an agency's decision to deny TSGLI benefits arbitrary and capricious. In *Fail v. United States*, the U.S. District Court for the District

of Colorado held that the Army's failure to review statements submitted by two plaintiffs' wives in support of their TSGLI claims was arbitrary and capricious:

> Mr. Andersonn's wife's statement is enough to permit the conclusion that Mr. Andersonn is qualified for benefits. . . . Mr. Andersonn's wife's statement is more than a *post hoc* opinion based on general patterns; it is a statement from a percipient witness about the specific limitations that Mr. Andersonn actually experienced. Although the statement is somewhat stilted, conclusory, and ambiguous, never quite articulating what the phrase "maximum help" means, it is nevertheless clear and unrebutted evidence that Mr. Andersonn indeed employed human assistance to perform the various ADLs during the 60-day time period set forth in the statement. The Army either failed to consider this evidence or simply discounted it without explanation, either of which would clearly be arbitrary and capricious action.

*Fail v. United States*, No. 12-cv-01761-MSK-CBS, 2013 WL 5418169, at *10 (D. Colo. Sept. 27, 2013); *id.* at *13 (same finding made with respect to statement submitted by plaintiff Melson's wife). The U.S. District Court for the Western District of Kentucky has likewise found that an agency's failure to consider caregiver statements submitted in support of a TSGLI claim may be arbitrary and capricious:

> Interestingly, the ABCMR made no reference to this letter or the additional letter tendered by Plaintiff's wife in May of 2013 even though both letters provided significant support for his claim, including the type or duration of assistance that Plaintiff required. *See Fail*, 2013 WL 5418169, at *13. "When the medical records do not explicitly address a patient's inability to independently perform the activities of daily living, letters from caregivers provide strong corroborating evidence of a patient's claim." *Koffarnus*, 175 F. Supp. 3d at 778 ("At the very least, the Board needed to respond to Koffarnus's spouse's letter, which corroborated her claim and was not frivolous."). *See also Conner v. U.S. Dept. of the Army*, 6 F. Supp. 3d 717, 723 (W.D. Ky. 2014) (an agency decision may be arbitrary and capricious if the agency does not address a nonfrivolous argument made by plaintiff). The ABCMR either failed to consider this evidence or simply discounted it without explanation, either of which would clearly be arbitrary and capricious action.

*Blackwood v. United States*, 187 F. Supp. 3d 837, 846–47 (W.D. Ky. 2016); *see also Carver v. United States*, No. 3:15CV-00401-JHM, 2016 WL 2654087 (W.D. Ky. May 9, 2016) (same).

Even in cases where an agency has explicitly addressed a caregiver's first-hand statement and discounted it, courts have found such decisions to be arbitrary and capricious if they fail to

16

adequately explain the basis for their decision. *See Hensley*, 292 F. Supp. 3d at 411 ("The Court cannot discern from the conclusory statements in the record why the Board discounted the affidavit of Hensley's wife, which if fully credited would establish his claim for TSGLI benefits.")

Here, as in the cases cited above, Rich's medical records do not explicitly address his inability to perform ADLs. Instead, such evidence is provided in Rich's own declarations summarizing his physical limitations following his accident and resulting surgeries, and the declarations of the caregivers who provided first-hand assistance to Rich during his recovery. The statements of Ms. Escobar and Ms. Clayton provide "strong corroborating evidence" of Rich's claim that he suffered 60 days of ADL losses. *See Koffarnus v. United States*, 175 F. Supp. 3d 769, 778 (W.D. Ky. 2016). But the BCNR's decision does not include any reference at all to these statements. Accordingly, the BCNR "either failed to consider this evidence or simply discounted it without explanation," either of which amounts to arbitrary and capricious action. *See Blackwood*, 187 F. Supp. 3d at 847.

### C. Whether it was arbitrary and capricious for the BCNR to only approve 30 days of ADL losses.

Rich further argues that the BCNR's decision was arbitrary and capricious because there is no basis for the conclusion that he suffered 30 days, but not 60 days, of ADL losses, and the decision is inconsistent with the evidence in his medical records. Pl.'s Reply 5-7 [ECF No. 19]. The BCNR reached the following conclusions:

> The Board understands that you suffered traumatic injuries and received assistance in the performance of ADLs after your release from the hospital on 23 May 2014. However, the Board was not convinced that the extent of your injuries required continued assistance to perform the ADLs through 22 July 2014. Despite the need for additional surgery on 8 July 2014, the Board felt there was insufficient medical evidence that showed you continued to suffer from serious symptoms from the initial treatment to your left leg and arms that prevented you from independently

17

performing ADLs after your second surgery. Further, the Board concluded that
your surgery to your right ankle was not sufficiently impairing to your ability to
independently perform ADLs that you would have required assistance.

AR 572. It is not clear how the BCNR reached these conclusions.

Although the BCNR's decision does not specifically mention or adopt the Navy's prior conclusion that Rich suffered only 43 days of ADL losses, *see* AR 480, the conclusion appears several times in the Administrative Record and in the government's briefing in this matter. There are at least three different, and inconsistent, "explanations" offered for how the conclusion was reached. First, the December 23, 2014 email from Mary Koontz to Rich states:

> CS1, the reason you were denied is despite being bilateral lower legs, your medical records clearly states [sic] you were weight bearing on crutches and you started physical therapy on day 43. Both which stop any ADL losses.

AR 27. However, there is no mention of crutches anywhere in the medical records, and the medical records clearly show that Rich did not receive a referral for physical therapy until July 25, 2014 [65 days post-accident] and did not begin physical therapy (on his left leg only) until July 31, 2014 [71 days post-accident]. AR 439.

In its Memorandum in Support of its Motion for Summary Judgment, the government then offered the following explanation:

> On June 24, 2014, Plaintiff's medical records indicate that Dr. Shupe explained that he would remove Plaintiff's cast from his left leg before performing surgery on his right leg. AR 454. Then on July 7, 2014, Plaintiff had surgery on his right leg. AR 450. Plaintiff's medical records indicate that Dr. Shupe instructed Plaintiff to be non-weight-bearing on his right leg but that Plaintiff was *released without limitations*. AR 451. This is in stark contrast to Dr. Shupe's previous medical notes in Plaintiff's medical record. This statement cannot be found in the notes prior to July 7, 2014. This is clear evidence that cuts against Plaintiff's argument that he "required" assistance with ADLs during the second 30-day period and establishes that the agency's decision was not arbitrary and capricious. This is also a distinguishing factor in why the agency stated the medical documentation supported only 43 days, instead of 60 days.

Mem. in Supp. of Def.'s Mot. for Summ. J. 19.  There are at least two factual errors in this argument that are directly contradicted by Rich's medical records: (1) Rich had surgery on his right leg on July 8, 2014, and (2) there are multiple instances prior to July 7, 2014 in which Dr. Shupe's notes indicate that Rich was "Released without Limitations," the first of which is on May 27, 2014, only 6 days post-injury and 4 days after the defendant was released from the hospital.  *See* AR 468.  Dr. Shupe's notes from that date also indicate that Rich was non-weightbearing on his left leg and weightbearing as tolerated on his right.  *Id.*  Based on this, it is clear that Dr. Shupe's decision to release Rich "without limitations" did not have anything to do with his weightbearing status or his ability to independently perform ADLs at home.

>The government offered a third explanation in its Reply brief:
>
>In Plaintiff's initial application for TSGLI, certified by Dr. Paul Shupe (a physician, Plaintiff's Orthopedic Surgeon and a percipient witness to Plaintiff's limitations) on November 7, 2014, Dr. Shupe certified that Plaintiff required hands-on assistance with bathing, dressing, eating, toileting, and transferring from May 21, 2014 until July 2, 2014.  AR 12-13.  There are 43 days between those two dates, if the start and end date are included.  This is consistent with Defendant's approval of 30 days but not 60 days of TSGLI benefits.

Def.'s Opp'n and Reply 6-7 [ECF No. 16].  But these *post hoc* explanations by the government do not satisfy the BCNR's obligation to adequately explain the basis for its decision that Rich did not suffer 60 days of ADL losses.  The BCNR's decision thus "omitted the critical step – connecting the facts to the conclusion."  *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995).  Similar to the Air Force's analysis in *Hensley*, here the BCNR's analysis consisted of conclusory statements "without providing an account of how it reached its results."  *Hensley*, 292 F. Supp. 3d at 412 (quoting *Dickson*, 68 F.3d at 1405).  Accordingly, the Court finds that the BCNR's decision was arbitrary and capricious.   The BCNR's decision will therefore be vacated, and this case will be remanded to the BCNR so that it may reconsider Rich's claim by taking into

account all of the record evidence and adequately explain the basis for its decision. The Court denies Rich's motion to the extent it requests the Court order the BCNR to obtain an advisory opinion on his claim.

## IV. CONCLUSION

For these reasons, the Court GRANTS IN PART and DENIES IN PART Rich's motion, DENIES the United States's motion, VACATES the BCNR's decision, and REMANDS the case to the BCNR for further proceedings consistent with this Opinion. An appropriate Order accompanies this Opinion.

_____
Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE

March 28, 2019